**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gerald M. Hall; Pamela J. Hall, | ) No. CV-06-0205-PHX-FJM |
| Plaintiffs, | ) **ORDER** |
| vs. | ) |
| Elvira J. Manschot, | ) |
| Defendant. | ) |

The court has before it plaintiffs' motion for partial summary judgment (doc. 35), defendants' response and cross-motion for summary judgment on count I (doc. 43), plaintiffs' reply (doc. 52), and defendants' reply (doc. 57). We also have before us defendants' motion for partial summary judgment on count II (doc. 37), plaintiffs' response (doc. 50), defendants' reply (doc. 54); defendants' supplement to motion for summary judgment (doc. 56), and plaintiffs' response (doc. 73).

**I – Background**

On March 9, 2002, plaintiffs Gerald Hall and Pamela Hall entered into a purchase agreement with Elvira Manschot in which the Halls agreed to purchase the Manschot's residence for $1,350,000. The closing date was set for April 4, 2002. On March 11, 2002, Elvira Manschot provided the Halls with a property disclosure statement containing the question, "Has the property ever been flooded?" Manschot responded "no." PSOF, exhibit

1  3.  On March 22, 2002, following an inspection of the residence, the Halls sent a letter
2  requesting numerous repairs to the property prior to the April 4, 2002 closing.  In particular,
3  the Halls addressed two water-related issues:

> 1. The source of the water leak on the driveway must be located and repaired, with paperwork forwarded to us
> . . . .
> 5. Water damage in garage next to water heater–sheetrock wet and torn away.

DSOF, exhibit B ("inspection letter").

On April 4, 2002, the Halls sent a letter to the title company instructing it not to close escrow:

> As a result of the *plumbing/irrigation problem* at the subject property, which is compounded by the fact that at the present time we do not have a definitive cause and/or solution to the problem, please consider this my instruction to NOT close escrow and record conveyance documents . . . .

Id., exhibit E (emphasis added) ("title company letter").  On April 5, 2002, in response to the Halls' letter, Mrs. Manschot made written assurances to the Halls:

> If the water problem are [sic] not repaired prior to close of escrow GERALD M. HALL and PAMELA J. HALL has [sic] my assurance that it will be corrected at no cost to them.

Id. at exhibit F ("April agreement").  Based upon this assurance, the Halls agreed to go forward with the closing.  The purchase of the property was consummated on April 5, 2002, and a warranty deed was recorded conveying the property from Manschot to the Halls.

Sometime after closing, the Halls experienced water problems on the property.  They initially submitted a claim to their insurance company, which hired the consulting firm Ninyo & Moore to investigate the water issue.  Although the Halls claim they experienced the water problems "almost immediately after the closing," First Amended Complaint ¶ 22, Ninyo & Moore did not conduct the investigation until March 5, 2004, almost two years later.  DSOF, exhibit G.  Ninyo & Moore determined that the water problems were due to improper drainage and faulty construction of a 1997 addition to the property.  They concluded that after each rainfall water seeps into the laundry and storage rooms, and further that no precautions were taken to divert water runoff from Mummy Mountain.

The Manschots refused the Halls' demands to remediate the drainage problem. Thereafter, the Halls incurred approximately $200,000 in out-of-pocket costs to correct the problems themselves. The Halls filed this action originally against Elvira Manschot only, asserting claims for breach of contract and strict liability. We granted plaintiffs' motion to amend the complaint to assert claims against Elvira's husband, Robert Manschot, based on a theory that Mr. Manschot held a resulting trust in the property (doc. 28).

## II – Breach of Contract

The Halls claim that the Manschots breached the purchase agreement, the disclosure statement, and the April agreement when they failed to disclose the drainage problem and refused to remediate the defect. Prior to closing, Elvira Manschot stated in the April agreement that "[i]f the water problem are [sic] not repaired prior to close of escrow . . . it will be corrected at no cost to them." DSOF, exhibit F. The term "the water problem" is ambiguous on its face–there is nothing in the April agreement that defines the term. Where an ambiguity exists on the face of a document or the language is reasonably susceptible to differing interpretations, parol evidence is admissible to determine the meaning intended by the parties. Johnson v. Earnhardt's Gilbert Dodge, Inc., 212 Ariz. 381, 384, 132 P.3d 825, 828 (2006); Taylor v. State Farm Mut. Auto. Ins. Co., 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993). Because a key term in the April agreement is ambiguous, we will consider evidence extrinsic to the agreement in order to determine the parties' intent regarding the term "the water problem."

The Manschots contend that they agreed to correct only the two water-related issues that were specifically identified in the Halls' inspection letter–the "water leak on the driveway" and "water damage in garage next to water heater." DSOF, exhibit B. The Halls, on the other hand, urge an expansive interpretation of "the water problem," contending that Elivra Manschot agreed to "correct all the water problems at no cost." Plaintiffs' Motion at 5. They claim that prior to closing they "noticed water leaks and moisture problems throughout the residence, and on at least one occasion, saw standing water in the laundry and storage rooms by the garage." PSOF ¶ 19. They allege that they "voiced their concerns

- 3 -

about this water to the Manschots and threatened to cancel the closing if the issue were not remedied." Id. ¶ 20.  They further claim to have "memorialized their concerns" in the letter to the title company, in which they described the water issue as a "plumbing/irrigation problem," for which there was "no definitive cause and/or solution."  PSOF ¶ 21.

An issue of fact exists as to whether the parties intended the April agreement to include the Manschots' obligation to remediate the flooding/drainage problem. Although the Halls claim to have noticed standing water in the laundry and storage rooms, it is not clear whether they notified the Manschots of this particular concern, such that it was incorporated into "the water problem" that Mrs. Manschot agreed to correct.  Therefore, the parties' understanding of the term "the water problem" is a question for the trier of fact.  We deny both parties' motions for summary judgment related to the breach of the April agreement in count I.

Plaintiffs also claim that the Manschots breached the purchase agreement and disclosure statement by failing to disclose a material latent defect, namely the flooding in the laundry and storage rooms.  We also conclude that an issue of fact exists as to whether the Manschots had knowledge of this flooding problem prior to closing.  Elvira Manschot acknowledges in her deposition testimony that she was aware of water problems both inside and outside the residence prior to closing. Id. ¶ 42. On at least one occasion she observed a puddle of water in the laundry room. Id. ¶ 44. She claims, however, that this water was observed during construction only and that it was corrected at that time. DSOF ¶ 18. The Manschots also present evidence of historic rainfall data showing drought conditions during the relevant time frame, which they claim establishes that they could not have known about the flooding problem prior to closing.

Because an issue of fact exists as to whether the Manschots were aware of the flooding/drainage problem prior to closing, we deny both parties' motions for summary judgment on the breach of contract claims relating to the purchase agreement and the disclosure statement in count I.

### III – Strict Liability

Plaintiffs admit that defendants' motion for summary judgment on count II (strict liability) should be granted. Defendants argue that the strict liability claim was frivolous and they therefore seek attorney's fees in the amount of $2,702 incurred in defending against this claim. Defendants' Reply at 2. We reject defendants' request for fees. Plaintiffs state that during discovery they realized that the strict liability claim was without merit and informed defendants' counsel that they did not intend to pursue the claim. Plaintiffs' Response at 11. Plaintiffs further advised the court that they would "probably . . . remove that claim." Rule 16 Scheduling Conf. Transcript (Sept. 15, 2007). Despite plaintiffs' notice to the court and to counsel that the claim would likely be abandoned, defendants' counsel chose to challenge the claim in their motion for summary judgment. While plaintiffs should have stipulated to the dismissal of that claim under Rule 41(a), Fed. R. Civ. P., under these facts, imposition of attorney's fees against plaintiffs is unwarranted. We grant defendants' motion to dismiss count II (strict liability) and deny defendants' request for fees (doc. 37).

### IV – Defendant Robert Manschot

At the time of the sale, the title documents indicated that the residence was owned by Elvira Manschot as her sole and separate property. Therefore, plaintiffs originally named Elvira Manschot as the only defendant. We subsequently granted plaintiffs' motion to amend the complaint to name Robert Manschot as a defendant, based on a theory that Robert held a resulting trust in the property. Robert now moves to be dismissed from this case.

The residence was previously owned by both Elvira and Robert Manschot as community property until November 15, 2001, less than four months before the property was placed on the market. Robert contends that on November 15, 2001, he conveyed his entire interest in the property to Elvira by way of warranty deed, and that at the time of the sale he had no interest in the property, did not sign the purchase agreement, and made no promises, representations or warranties in conjunction with the sale. He claims that because he was not a party to the purchase agreement, he is not liable under that contract. Plaintiffs, on the other

1 hand, argue that Robert Manschot's continued control over the property after its transfer to
2 Elvira created a resulting trust in his favor, and that he is therefore a proper party in this case.

3       A resulting trust is an equitable trust, not subject to the statute of frauds, and arises
4 when a person makes a disposition of property "under circumstances which raise an inference
5 that he does not intend that the person taking or holding the property should have the
6 beneficial interest therein."  Restatement (Second) of Trusts §§ 404, 406 (1959); see
7 Gabitzsch v. Cole, 95 Ariz. 15, 19, 386 P.2d 23, 26 (1963); Wheel of Life Found., Inc. v.
8 Ladwig, 15 Ariz. App. 523, 526-27, 489 P.2d 1225, 1228-29 (Ct. App. 1971) (noting that
9 Arizona courts rely on the Restatement in determining whether a resulting trust has arisen).
10 When a transfer of real property is made to one person and the purchase price is paid by
11 another, a resulting trust is presumed in favor of the person by whom such payment is made.
12 Restatement (Second) of Trusts § 440.  But when a husband pays for property in the name
13 of his wife, there is a presumption that a gift was intended and no resulting trust arises. Id.
14 at § 442.  The presumption of a gift may be rebutted, however, and a resulting trust
15 established, through clear and convincing evidence that the transferor did not intend the
16 transferee to have a beneficial interest in the property. Id. at § 443; Sloane v. Sloane, 132
17 Ariz. 414, 415, 646 P.2d 299, 300 (1982).  For example, the presumption of a gift may be
18 rebutted by showing that after the transfer the payor managed and controlled the property,
19 collected rents, paid taxes and insurance, and otherwise asserted ownership, and that the
20 transferee acquiesced in such assertion.  Restatement (Second) of Trusts § 443 cmt. a.

21       Elvira testified that Robert transferred the property to her without consideration, made
22 all payments related to the property, and exercised complete dominion and control over the
23 property, including the decision to sell it, which she opposed. Plaintiffs' Separate SOF ¶¶
24 8-9.  She tellingly stated that "[h]e decided everything." Id. ¶ 9.  Defendants submit no
25 evidence to contradict this testimony.  We conclude that this evidence clearly demonstrates
26 that Robert Manschot did not intend Elvira to have a beneficial interest in the property and
27 rebuts the presumption that the transfer of the residence was intended as a gift.  Robert
28

1  Manschot retained an interest in the property in the form of a resulting trust and is therefore
2  a proper party to this action.

### V.

**IT IS THEREFORE ORDERED DENYING** plaintiffs' motion for partial summary judgment (doc. 35), and **DENYING** defendants' cross-motion for summary judgment on count I (doc. 43).

**IT IS FURTHER ORDERED GRANTING** defendants' motion for partial summary judgment on count II, but **DENYING** defendants' request for attorney's fees on this claim (doc. 37). **IT IS FURTHER ORDERED DENYING** Robert Manschot's motion for summary judgment (doc. 37).

DATED this 27th day of September, 2007.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge